

**SO ORDERED.**



**SIGNED this 18th day of July, 2013.**

UNITED STATES BANKRUPTCY JUDGE

---

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

| | |
|---|---|
| **In re:** | |
| **George Salisbury Barnhart,** | **Case No. 11-80030 7** |
| **Debtor.** | |
| **C&B Farms, Inc.,** | |
| **Plaintiff,** | |
| **-vs-** | |
| **George Salisbury Barnhart,** | **Adv. Proc. No. 11-09059** |
| **-and-** | |
| **Leasing Unlimited of Southern Pines, Inc.** | |
| **Defendants.** | |

**MEMORANDUM OPINION**

THIS MATTER came on before the Court for trial in Durham, North Carolina after due and proper notice. Wayne P. Robbins appeared on behalf of George Salisbury

Barhardt and Jeremy Todd Browner appeared on behalf of C&B Farms, Inc. After considering the pleadings, evidence, arguments of counsel and testimony of witnesses, the Court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure:

## JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), which this Court has the jurisdiction to hear and determine. Pursuant to the analysis in *Stern v. Marshall*, 564 U.S. __, 131 S. Ct. 2594 (2011), the Court may enter a final order in this matter.

## PROCEDURAL HISTORY & FACTS

### I. Leasing Unlimited

Leasing Unlimited of Southern Pines, Inc. (“Leasing Unlimited” or “Company”) was a lease brokerage firm that incorporated in North Carolina in 1987. Leasing Unlimited had a general dealer agreement with financiers such as Wells Fargo Financial Leasing (“Wells Fargo”) and received commissions for brokering lease arrangements between the financiers and other clients. George Salisbury Barnhardt (the “Debtor”) was president, director, chief operating officer, and sole shareholder of Leasing Unlimited. The Debtor’s father held an officer position as the assistant secretary. Leasing Unlimited maintained its business in office space leased from the Debtor. Leasing Unlimited held corporate meetings on an as-needed basis, and only the Debtor and the assistant secretary attended those meetings. The Company ceased operations in September 2010.

The Debtor's duties at Leasing Unlimited included remitting funds due to the lessees or appropriate parties. The Debtor had sole authority for signing checks to transfer the funds in the Company's bank accounts between the Company's bank accounts and sole authority to transfer the funds out of the Company's bank accounts. The Debtor's father, in his capacity as the assistant secretary, assisted the Debtor in making decisions for Leasing Unlimited, signed minutes from corporate meetings, and helped with the bookkeeping of the Company's bank accounts. Leasing Unlimited hired independent contractors to broker leasing arrangements with clients. The Company employed accountants who kept records of its finances, filed annual reports with the North Carolina Department of the Secretary of State, and filed corporate taxes. Leasing Unlimited maintained a general ledger (the "General Ledger") for its bank accounts and noted, among other things, payments to the Debtor for rent, the Debtor's receivable as an officer, and repayment on a promissory note ("Note") in favor of the Debtor and the Debtor's wife. (Pl.'s Ex. 6.)

**II. The Lease-Back Arrangement**

Charles Obern is president of C&B Farms, Inc. ("C&B Farms"), a vegetable-producing farm that is incorporated in Florida. C&B Farms needed cash to purchase irrigation equipment, and C&B Farms had been unsuccessful in finding an arrangement by which a bank would lend C&B Farms funds by taking a security interest on its farming equipment. However, in August 2009, Mitch Watson,[1] an independent contractor and broker with Leasing Unlimited, approached Charles Obern about brokering a financing arrangement between C&B Farms and Wells Fargo ("Lease-Back Arrangement"). In the Lease-Back Arrangement, C&B Farms would provide Wells Fargo

[1] Mitch Watson was not present at the trial as neither party could find Mitch Watson prior to the trial.

title to its equipment in exchange for a loan in the amount of $142,000.00. (Pl.'s Ex. 1.) C&B Farms was to repay Wells Fargo as Wells Fargo was now the lessor of the equipment and C&B Farms was the lessee. (Pl.'s Ex. 1.) To initiate the Lease-Back Arrangement, in November 2009, Charles Obern, on behalf of C&B Farms, executed an Equipment Lease Agreement with Wells Fargo to turn over title to its equipment.[2] (Pl.'s Ex. 1.) The lease was for a term of fifty-five months with annual payments of $38,156.05; the first payment was due in June 2010.[3] (Pl.'s Ex. 1.) C&B Farms was to receive the $142,000.00 within two weeks after execution of the Equipment Lease Agreement pursuant to the Lease-Back Arrangement.

**III. The Wire-Transfer**

On or about November 11, 2009, Wells Fargo wired $145,958.46 to Leasing Unlimited (the "Wire Transfer") pursuant to the Equipment Lease Agreement. (Pl.'s Ex. 6.) The Company's standard practice was to retain a portion of the funds as commission and remit the balance to the lessee. The Debtor was in charge of those duties. As such, in this transaction, $142,000.00 should have been remitted to C&B Farms and the balance retained by Leasing Unlimited as commission. However, C&B Farms never received the monies, and Leasing Unlimited did not inform C&B Farms of the receipt of the monies.

[2] The few lease-related documents offered into evidence do not precisely or accurately describe the Lease-Back Arrangement. No document offered into evidence is signed by Wells Fargo, C&B Farms, and Leasing Unlimited. A document titled "Bill of Sale" was entered into evidence. (Pl.'s Ex. 1.) The Bill of Sale lists Leasing Unlimited as the seller and Charles Obern as the buyer of John Deere pumps. (Pl.'s Ex. 1.) It is signed by Charles Obern, president of C&B, but not by Debtor or any agent of Leasing Unlimited. (Pl.'s Ex. 1.) The Equipment Lease Agreement, on its terms, was a two-party agreement between C&B Farms and Wells Fargo. (Pl.'s Ex. 1.) There is also no document offered into evidence of the broker-financier arrangement between Wells Fargo and Leasing Unlimited. The Debtor and C&B Farms, however, agree that the Lease-Back Arrangement was between Wells Fargo, Leasing Unlimited, and C&B Farms. The parties to the litigation do not dispute the payment terms of the Lease-Back Arrangement.

[3] There was an agreement that C&B Farms would not be billed until after the farm harvest.

Since C&B Farms had not received the funds, Charles Obern assumed that execution of the Equipment Lease Agreement was not successful, and thus, C&B Farms was not bound by it. However, pursuant to the Equipment Lease Agreement, in May of 2010, C&B Farms began receiving invoices from Wells Fargo for the first annual payment under the Equipment Lease Agreement. C&B Farms did not make the payments to Wells Fargo.

**IV. Leasing Unlimited's Accounting after the Wire Transfer**

It is undisputed that Leasing Unlimited failed to disperse the funds to C&B Farms. The General Ledger shows that between November 11, 2009 and September 2010, the company continued to pay for regular business expenses such as purchasing inventory, paying independent contractors, paying for utilities, janitorial services, advertising, repairs, maintenance, sale deposits, and broker commissions. (Pl.'s Ex. 6.) During this time, the Company also made a series of money transfers to the Debtor and Debtor's wife totaling $69,815.59. The General Ledger shows that these amounts were for salary, rent, and the Note. (Pl.'s Ex. 6.) Leasing Unlimited's balance sheet as of April 30, 2010, as prepared by its certified public accountant, shows the total of Leasing Unlimited's assets as $1,075,843.18, and the total of liabilities as $701,982.82. (Pl.'s Ex. 10.)

**V. The Dispute**

Wells Fargo commenced litigation in Iowa on September 10, 2010 demanding payment from C&B Farms. C&B Farms responded on December 15, 2010 by filing an answer and third party complaint against Leasing Unlimited, the Debtor, and Mitch Watson. Subsequently, on January 6, 2011, the Debtor filed a chapter 7 petition

("Petition"). In the Petition, the Debtor listed C&B Farms as a creditor holding a disputed unsecured non-priority claim ("Claim") due to the pending litigation in Iowa.[4]

C&B Farms filed an adversary proceeding on June 3, 2011 objecting to the Debtor's discharge pursuant to 11 U.S.C. §§ 523 (a)(4) and (a)(6) ("Adversary Proceeding"). In the Adversary Proceeding, C&B Farms also seeks to pierce the corporate veil and declare its Claim nondischargeable. This Court denied cross motions for summary judgment. The issues before the Court are:

(1) Whether to pierce the corporate veil of Leasing Unlimited to find the Debtor is personally liable to C&B Farms;

(2) Whether C&B Farms' Claim is nondischargeable under 11 U.S.C. § 523(a)(4) of the Bankruptcy Code; and

(3) Whether C&B Farms' Claim is nondischargeable under 11 U.S.C. § 523(a)(6) of the Bankruptcy Code

## ANALYSIS

### I. Piercing the Corporate Veil

C&B Farms argues that the Court should pierce the corporate veil so that the Debtor will be personally liable for its Claim against Leasing Unlimited. To prevent fraud or to achieve equity, a court will pierce the corporate veil and extend liability for corporate obligations beyond the confines of a corporation's separate entity. *Glenn v. Wagner*, 313 N.C. 450, 454 (1985). In North Carolina, courts apply the instrumentality rule to determine whether to pierce the veil. *Id.* The instrumentality rule states that a "corporation which exercises actual control over another, operating the latter as a mere

[4] The litigation in Iowa is stayed as result of the Debtor filing the Petition.

instrumentality or tool, is liable for the torts of the corporation thus controlled." *Id.* The elements of the instrumentality are:

> (1) [c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; [5] and
> (2) [s]uch control must have been used by defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal right; and
> (3) [t]he aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of

*Id*. at 455; *Timber Integrated Invs., LLC v. Welch*, 737 S.E.2d 809, 817 (N.C. App. 2013). Courts should also consider other factors in deciding whether to pierce the corporate veil such as inadequate capitalization, non-compliance with corporate formalities, complete domination and control of the corporation so that it has no independent identity, and excessive fragmentation of a single enterprise into separate corporations. *Glenn*, 313 N.C. at 455. The presence or absence of one factor is not determinative; rather, it is the combination of facts that indicate that the corporate entity had no separate mind of its own and was therefore just the instrumentality of the defendant. *Glenn*, 313 N.C. at 458. The party seeking to pierce the corporate veil bears the burden of proof. *Kinney Shoe Corp. v. Polan,* 939 F.2d 209, 211 (4th Cir. 1991).

The Debtor was the president and sole shareholder of Leasing Unlimited. Leasing Unlimited observed corporate formalities such as registering with the North Carolina

[5] A non-exhaustive list of factors to consider to determine whether sufficient control and domination is present to satisfy the first prong include non-payment of dividends, insolvency of the debtor corporation, siphoning of funds by the dominant shareholder, non-function of other officers or directors, and absence of corporate records. *Timber Integrated,* 737 S.E.2d at 818.

Secretary of State, holding corporate meetings,[6] keeping records of its finances, filing corporate taxes and annual reports, and keeping separate Company bank accounts. All of these facts support not piercing the corporate veil. *But see Keels v. Turner*, 262 S.E.2d 845 (N.C. App. 1980) (finding the trial court erred by not piercing the corporate veil when the corporation had no meetings and no issuance of stock; the corporate name did not comply with the law, and the corporation did not observe any other corporate formalities). Furthermore, Leasing Unlimited had employees, such as accountants and independent contractors, to help run its business and negotiate leasing arrangements; the Debtor was not the sole decision making authority, as the Debtor's father, the assistant secretary, also assisted with business decision making. Leasing Unlimited's business practices put outsiders on notice that it was a corporation; business activities were handled by employees and independent contractors other than the Debtor. *See Dorton v. Dorton*, 77 N.C. App. 667, 671-72 (1985) (finding trial court erred in disregarding corporate entity on basis of non-compliance with corporate formalities when plaintiff knew of the existence of corporation); *N.C. Equip. Co. v. DeBruhl*. 220 S.E. 2d 867 (N.C. App. 1976) (holding evidence supported that plaintiff knew or should have known that defendant was acting as representative of a corporation rather than in a personal capacity by the corporate formalities observed).

Furthermore, Leasing Unlimited's assets exceeded one million dollars at the time of the transaction with C&B Farms, and Leasing Unlimited continued to operate and conduct other leasing arrangements with its clients after the C&B Farms transaction. Even though the Debtor and the Debtor's wife received approximately $69,815.59 from

[6] Even though Leasing Unlimited did not hold regular board or shareholder meetings, the Debtor would meet with the assistant secretary for meetings on an as needed basis to make corporate decisions. The assistant secretary would record and sign the minutes to the meetings.

Leasing Unlimited's funds between the time of the Wire Transfer and August 27, 2010, those payments did not prevent payments to creditors as the Company's General Ledger showed that the Company was still paying its normal business expenses. *See State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431 (2008) (the court found that if the allegations are true and that the shareholders directed funds away from the corporation so that the corporation was unable to pay its creditors, it would support the contention that corporation was a mere instrumentality of its shareholders). In fact, the $69,815.59 received by the Debtor and his wife compared to the Company's total assets of approximately $1,075,843.18, further shows the transfer did not cause Leasing Unlimited to become insolvent.

This is not a situation in which the Debtor was the sole decision maker and acted alone in all negotiations when running an inadequately capitalized corporation, such that there was no separate existence between the Debtor and Leasing Unlimited. *See E. Mkt. St. Square v. Tycorp Pizza IV, Inc.*, 175 N.C. App. 628 (2006) (finding that the facts support piercing the corporate veil because the corporation had no separate mind of its own; the defendant was the sole director and shareholder, conducted all negotiations, made all decisions for the corporation, and the corporation was inadequately capitalized). The Court finds that the Debtor did not control Leasing Unlimited so that the corporate entity at the time of the C&B Farms transaction had no separate mind, will, or existence of its own. As such, the first element of the instrumentality rule is not satisfied. The Court will not pierce the corporate veil.

**II. Nondischargeability**

Nondischargeability claims are generally construed narrowly to protect the purpose of providing the debtor a fresh start. *See In re Rountree*, 478 F.3d 215, 219 (4th Cir. 2007) (citing *In re Biondo*, 180 F.3d 126, 130 (4th Cir. 1999)). The party claiming an exception to discharge bears the burden of proving by a preponderance of evidence that the claim is not subject to discharge. *Grogan v. Garner*, 498 U.S. 279, 285-86 (1991). C&B Farms argues that the Debtor should not be able to discharge the Claim as C&B Farms alleges that the Debtor committed fraud or defalcation in the Debtor's fiduciary capacity and that the Debtor embezzled those funds which belonged to C&B Farms. *See* 11 U.S.C. § 523(a)(4). C&B Farms also alleges that the Debtor caused willful and malicious injury to it under 11 U.S.C. § 523(a)(6)

**A. 11 U.S.C. § 523(a)(4)**

Section 523(a)(4) excepts from discharge any claim "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). C&B Farms alleges that the Claim is nondischargeable because the Debtor committed fraud or defalcation while acting in a fiduciary capacity and because the Debtor embezzled funds.

**Fraud or Defalcation while acting in a Fiduciary Capacity**

A plaintiff seeking to show that a debt should be nondischargeable due to fraud or defalcation while the defendant acted in a fiduciary capacity must show: (1) that the debt in issue arose while the debtor was acting in a fiduciary capacity and (2) that the debt arose from the debtor's fraud or defalcation. *In re Strack*, 524 F.3d 493, 497 (4th Cir. 2008). The existence of fiduciary capacity is a question of federal law, though state law

may be considered in the inquiry. *See Am. Bankers Ins. Co.v. Maness*, 101 F.3d 358, 363 (4th Cir. 1996) (stating that "while federal law creates the bankruptcy estate, … state law, absent a countervailing federal interest, determines whether a given property falls within this federal framework."). *See also In re York*, 205 B.R. 759, 763 (E.D.N.C. 1997). The term 'fiduciary' as used in 523(a)(4) is restricted to "the class of fiduciaries including trustees of specific written declarations of trust, guardians, administrators, executors, or public officers and, absent special considerations, does not extend to the more general class of fiduciaries such as agents, bailees, brokers, factors, and partners." *In re Venable*, 2002 WL 523908, *3 (Bankr. M.D.N.C. March 26, 2002). Defalcation includes a culpable state of mind described as one involving knowledge of, or gross recklessness in respect to, the improper nature of the fiduciary duty. *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1757 (2013).

C&B Farms argues that the Debtor acted as a loan broker and an express trust was created when Wells Fargo transferred the funds to Leasing Unlimited. North Carolina General Statute § 66-106(a)(1) states: [a] 'loan broker' is any person, firm, or corporation who, in return for any consideration from any person, promises to (i) procure for such person, or assist such person in procuring, a loan from any third party; or (ii) consider whether or not it will make a loan to such person. N.C. Gen. Stat. § 66-106(a)(1).

In this case, the Debtor had no contact with C&B Farms or any of its officers for the purposes of procuring the loan from Wells Fargo. All the negotiations for procuring a loan were made between C&B Farms and Mitch Watson, an independent contractor of Leasing Unlimited. There is no evidence on record that the Debtor promised to procure for C&B Farms a loan from any third party. There is no document offered into evidence

that is executed by the parties to this litigation and delineates specific fiduciary duties to Leasing Unlimited. *See In re Walker*, 416 B.R. 449 (Bankr. W.D.N.C. 2009). Thus, even assuming *arguendo* that the statute clearly delineates fiduciary duties, the North Carolina General Statutes for a loan broker or a real estate loan broker do not apply to the Debtor and the Debtor was not acting in a fiduciary capacity under state law and certainly not federal law. Furthermore, C&B Farms, as a matter of law, cannot establish a fiduciary duty pursuant to an express trust. *In re Venable*, 2002 WL 523908, at *3. The first element is not fulfilled as the Debtor did not have a fiduciary duty. As such, the Court does not need to reach the issue of fraud or defalcation.

**Embezzlement**

Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. *In re DeBerry*, 2012 WL 1463598, at *5 (Bankr. M.D.N.C. 2012). A debt may be nondischargeable for embezzlement under 11 U.S.C. § 523(a)(4) without the existence of a fiduciary duty. *Bullock*, 133 S.Ct. at 1760; *In re DeBerry*, 2012 WL 1463598, at *5. The elements of embezzlement are: (1) entrustment to the debtor of (2) property (3) of another (4) which the debtor appropriates for his or her own use (5) with intent to defraud. *In re Groover*, 2004 WL 212948, *7 (Bankr. M.D.N.C. 2004). *See In re York*, 205 B.R. at 764 (stating the plaintiff must show (1) the fraudulent, or knowing and willful, (2) misapplication or conversion (3) of property, (4) which belongs to another, (5) by a person to whom such property has been entrusted or into whose hands it has lawfully come). A defense asserting that the property was entrusted to a corporation will not shield an individual debtor from liability under 11 U.S.C. § 523(a)(4), particularly when

the debtor is a president and manager of a corporation. *See Matter of Berkemeier*, 51 B.R. 5, 6-7 (Bankr. S.D. Ind. 1983) (finding that that an individual will not be permitted to shield himself by asserting that he was acting as an employee-officer of a corporation).

In this case, Leasing Unlimited received $145,958.46 from Wells Fargo into one of its bank accounts. Of this amount, $142,000.00 belonged to C&B Farms. However, those funds were never remitted to C&B Farms. The Debtor knew that the funds entrusted to Leasing Unlimited belonged to a lessee; it was Leasing Unlimited's standard practice to receive funds and remit to a lessee in similar lease-back arrangements. The General Ledger showed that the monies were used by Leasing Unlimited for ordinary business operations. The Debtor signed the checks that transferred monies out of the Company's bank accounts, and the Debtor was the only person with that authority. Thus, the Debtor knowingly misappropriated property that belonged to C&B Farms that was entrusted to him. *See In re* Groover, 2004 WL 212948, at *7 (stating that similar to a claim under § 523(a)(2), regarding embezzlement, a debtor may appropriate money for his or her own use by depositing the money into the account of a corporation which is controlled or owned by the debtor). The Court finds that the elements for 11 U.S.C. § 523(a)(4) for embezzlement are met, and the Debtor embezzled those funds. As such, the Debtor may not discharge the Claim.

**B. 11 U.S.C. § 523(a)(6)**

The Court has found that the Debtor may not discharge the claim pursuant to 11 U.S.C. § 523(a)(4). As such, the Court will not address C&B Farm's claim for relief pursuant to 11 U.S.C. § 523(a)(6).

## CONCLUSION

The Court will enter a judgment consistent with the findings of fact and conclusions of law as set forth in this memorandum opinion.

**END OF DOCUMENT**

# SERVICE LIST

C&B Farms, Inc.
Plaintiff

Jeremy T. Browner
Attorney for Plaintiff

George S. Barnhart
Defendant

P. Wayne Robbins
Attorney for Defendant